## Uram, Appellant, *v.* American Steel & Wire Company of New Jersey.

Argued October 5, 1954. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Louis Vaira,* with him *J. Thomas Hoffman,* for appellant.

*Chauncey Pruger,* with him *Reed, Smith, Shaw & McClay,* for appellee.

OPINION PER CURIAM, November 15, 1954:

The judgment is affirmed on the opinion of Judge DREW for the court en banc. The verdict for the defendant resulted from a fair trial. The case was pains-

takingly submitted to the jury in a thorough and impartial charge at the conclusion whereof plaintiff's counsel, upon direct inquiry from the trial judge, expressly disclaimed any cause for complaint. The strictures now passed by the appellant on the conduct of the trial are unwarranted. The one cited instance of irritation shown by the trial judge occurred when it became necessary for him to caution a witness, called by the plaintiff, against any repetition of the witness's gratuitous injection into the case of highly irrelevant and prejudicial matter and was directly provoked by the witness's insolent and contumacious attitude toward the court's justified rebuke. The ultimate exclusion of certain evidence, which the trial judge had invited plaintiff's counsel to produce, was not error. The proffered testimony was at all times irrelevant and immaterial and had no proper place in the case.

Judgment affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Every judge, being human, can become angry, but every judge, being educated and conscientious, must know how to control his temper so that his wrath may not become the smoke of reason evaporating in the fires of personal controversy. Judicial equanimity is not so rare an article that it must be used parsimoniously during a trial. Particularly must a judge know how to bridle indignation and resentment in the presence of the jury because a jury is only too ready to ride any steed of emotion which the judge startles, urges, or spurs into action.

The jury regards the judge as the epitome of wisdom, the apogee of forbearance, the ultimate in propriety and the zenith of impartiality. Any fulmination, therefore, from the bench which strikes at a party liti-

gant, witness, or lawyer may easily be interpreted by the jury as the thunderbolt of aroused justice, and, from that moment, the target of the judge's Olympian rage can not expect an uninfluenced appraisement from the jury. Most often the display of ire from the bench has no bearing at all on the issue up for adjudication but the jury is not informed that they must ignore the high temper as they would ignore a high wind touching the roof of the courthouse.

Stephen Uram, the plaintiff in this case, owns in Rostraver Township, Westmoreland County, a 105-acre farm which is located about one-half mile from a zinc mill owned and operated by the defendant, The American Steel & Wire Company of New Jersey. Uram sued The American Steel & Wire Company of New Jersey for damages alleged to have been caused this farm by the smoke and fumes discharged from the defendant's mill, from 1939 to 1945. In developing his case before the jury the plaintiff called Vincent Makovich, a neighboring farmer, to testify as to conditions on and about the Uram farm. Makovich had lived in the area of the mill all his life. He was accordingly asked by plaintiff's counsel [Mr. Hoffman] if anything unusual had happened in Rostraver Township "with respect to the mill." The witness began to reply: "Yes, sir, we had 22 people die in—" when the following ensued: "Mr. Pruger: [Counsel for defendant] 'Oh, wait just a minute. I could ask for the withdrawal of a juror for that remark, but I am not going to because I am satisfied with this jury, but this man knows better than to make a remark like that, and so does Mr. Hoffman. We are not trying a smog case here now.' The Court: 'Well, we have no knowledge that Mr. Hoffman had any knowledge that the witness would make such a remark.' Mr. Pruger: 'Mr. Hoffman does know because he has had this witness on be-

fore.' The Court: 'The remark was entirely improper and it is now stricken from the record and the jury is instructed to disregard it. It has nothing to do with this case, and you are not to be prejudiced by it in any way. If this witness did know what he was saying he was being extremely unfair and very improper. And if you do anything like that again, if you knowingly do it, I will hold you in contempt of court, and that is no laughing matter because *I will put you in jail.*' "*

The Judge's display of temper here was not in keeping with the equipoise one expects from the bench. The judge is the only person in the courtroom who carries a sword of punishment and while it is true the situation may arise where its use is imperative, it is still always better if the judge can compel respect and obedience without unsheathing the blade of contempt. From the moment that the Judge threatened Makovich, Makovich could only testify staring out at prison gates yawning for his arrival; from this same moment the jury could only look upon the witness as a potential jailbird; from this moment the effectiveness of Makovich as a witness was gone.

The record of the trial unfortunately reveals that the Makovich incident was not the only time that the scales of justice trembled in the fury of judicial storm. John Protz was another witness called by the plaintiff *to testify to conditions* on and about the Uram farm. He had known this farm since boyhood. Asked about the farm he said that it was a good farm since 1940. The Court intervened: "The Court: Q. How can you testify that it was a good farm? Let's hear what your knowledge is, your background. A. Well, my own farm, I farmed years ago and I ought to know by going

---

* Italics throughout, mine.

around and looking at it. Q. Were you on the Uram farm? Did you walk over it? How often were you there? How do you know *so much* about the Uram farm? That is the question."

It is to be noted that the Judge's question was really four questions: 1. Were you on the Uram farm? 2. Did you walk over it? 3. How often were you there? 4. How do you know so much about the Uram farm? One can only conclude from reading the record that the Trial Judge was wrathful with this witness too. Otherwise, what is the explanation for the gratuitous sarcasm: "How do you know *so much* about the Uram farm?" It is obvious that here the Judge was belittling Protz' testimony. After these four rapid-fire questions put by the Judge, the witness only had an opportunity to reply to the last one as follows: "Well, when I was a youngster I knew about it when I walked these roads every day."

Not waiting for the elucidation he had asked of the witness, the Judge now fired further sarcasm: "I asked you in 1940. [The Judge, however, had not asked about 1940.] Please listen to the question. *We are going to be here for three weeks if we don't get down and not only ask intelligent questions, but have the witnesses listen and answer them.* Now, the last question, I believe was: What was the source of your information? I am not trying to quote Mr. Hoffman directly, but Mr. Hoffman wants to know how you knew about the Uram farm in 1940." This stricture about the witness not listening was entirely uncalled-for. There is nothing to suggest that John Protz was not listening. It might seem more likely that the Judge himself was not listening meticulously because after putting four questions he waited for only one answer. And then to charge Protz with holding up the case for three weeks was a grotesque exaggeration which held the witness up to

ridicule before the jury. Veniremen who do not want at all to serve in the jury box are not inclined to look benevolently upon a witness or his principal who will keep them on one case "for three weeks."

Witness Protz explained that he was familiar with the Uram farm because: 1. He was a farmer himself and looked at the Uram farm. 2. When he was a youngster he walked the roads on which the Uram farm adjoined. 3. He travelled along the farm in an automobile "a good many times." 4. He saw the farm with such regularity that he could see "it just kept fading away all the time."

But the Trial Judge was not satisfied. To plaintiff's counsel, Mr. Hoffman, he fretted: "Mr. Hoffman, this witness has not shown how he knows anything about this farm. You know that as well as I do. Now, let's get down to facts. *Let's not be wasting time.*"

One way perhaps not to waste time in trying a case is not to try it at all, but once it is agreed that a case is to go before a court and jury, some time is bound to be consumed in presenting the evidence. Mr. Hoffman was endeavoring to present his case and the witness was explaining how he knew the Uram farm. But the Trial Judge was annoyed with this witness and went on to suggest that the lawyer had conspired with the witness to keep facts away from the Court. "You know that as well as I do," the Judge frowned to the lawyer. In addition, the Judge, without intending to, threw some discrediting powder on whatever impression the lawyer had thus far made on the jury by suggesting that the lawyer was helping "to waste time."

Mr. Hoffman asked witness Protz further questions: "Q. Will you tell the Court and jury the extent of that smoke and where it went? A. Well, whenever the wind blows, whichever way the wind blows, they get it. If the wind blows east, west, north or south,

whichever way the wind blows, they get it. Q. What was the extent of it? A. Well, at times after a rain it seems to hold the smoke low. Of course when it—The Court: The question was the extent of the smoke coming out of the stacks, as I understand the question. Is that the question, Mr. Hoffman? Mr. Hoffman: That's right. The Court: All right. The rain doesn't have anything to do with that." Here the Judge apparently decided to testify himself. Mr. Hoffman had asked the extent of the smoke "and where it went." The witness testified the rain held the smoke low. This was a precise objective reply. But the Court interjected a meteorological observation which could not have failed to impress the jury, which looks upon the presiding judge, as indicated above, as the depository of all wisdom. Said the Judge: "The rain doesn't have anything to do with that." A dozen witnesses called by the defendant corporation to refute the testimony of the plaintiff's witness could not have been half as effective as the Judge's all-sweeping and categorical assertion that the rain could not hold the smoke down.

The Trial Judge was not quite satisfied with the plaintiff's case and he let the jury know this: "Well, Mr. Hoffman, what is troubling me is that this plant, according to the testimony we have already heard, has been in operation since 1915, I believe. Apparently there has been some deposit ever since that time. Now, I don't see between 1940 and 1945 just what the deposit, what difference the deposit has made. Now, it may be in degree and all that, but the way it is being brought out I don't think—"

In refuting the plaintiff's claim that his farm had been damaged by the emanations from its mill, the defendant called a witness Joseph Kuma who testified that the farm which he owned and which was close to defendant's mill had not suffered any damage from

the smoke and fumes. On the contrary, he asserted, it had achieved a very high state of productivity and that his farm had won the prize for the second best corn in the county. Cross-examining this witness, Mr. Hoffman endeavored to show that the Kuma farm was not the Arcadia its proud owner had described. Mr. Hoffman asked: "It is a fact, isn't it, that some of this splendid land of yours is on tax duplicate for eight dollars an acre and some for $15 an acre?" Defendant's counsel objected to this question and the Court reproved plaintiff's counsel with the remark: "Mr. Hoffman, now . . . let's not be trying to prejudice this case."

Mr. Hoffman protested that he wasn't trying to prejudice the case, and the following colloquy occurred: "The Court: Well, then, please tell me what is the purpose of your question? Mr. Hoffman: To show him the value of his land and that it is not the highly productive land that he claims it to be. It would certainly be on the tax duplicate for considerably more than that if it were the land he makes it out to be. The Court: Are you going to bring experts in to prove that? Mr. Hoffman: I will bring the tax duplicates in Monday if that is necessary. The Court: *Well, I want you to bring in anything that is necessary to back up your statement.* Mr. Hoffman: Very well, I shall. The Court: *I think it is very prejudicial unless you do so. And I want to know how the other land is assessed and so on, and at what percentage of the market value.* Now, if you are going to prove those things your question is perfectly proper. . . ."

What followed is almost incredible. After having ordered, in the jury's presence, plaintiff's counsel to bring in proof as to how the other land was assessed, the Trial Judge then refused to allow the evidence to be presented. The plaintiff produced a member of the

Westmoreland County Assessment Board to testify as to the manner in which he fixed values. Defendant's counsel objected and the Court sustained the objection. He went further and scolded plaintiff's counsel: "I think this is just another example that this record is very mixed up, that is back and forth and all around."

Mr. Louis Vaira, also counsel for the plaintiff, now advanced to side bar to protest to the Court: "We did this at the request of the Court." The Court agreed: "That is right, and the reason, I told you very frankly what the reason was." Mr. Vaira then explained that he intended to show how the witness evaluated property: "by consulting properly authorized real estate agents, the people who knew values in that area, and by an inspection by the County Assessor. . ." Defendant's counsel objected and what follows can only be described as amazing: "The Court: [Addressing defendant's counsel] Is it your position that you do not want to go into this any further? Mr. Pruger: That's right. The Court: You are willing to let it stand? Mr. Pruger: That's right. The Court: *I am only trying to protect your client.* If that is your position, I will sustain your objection to it now, *but my purpose was to protect your client,* because I thought it was not only an irrelevant and immaterial question when asked, but that it was highly prejudicial and improper. Mr. Vaira: Then can we go any further with this witness? The Court: No. Mr. Vaira: I want this on the record: these two witnesses were brought in at the suggestion —not at the suggestion, but *because the Court stated on Friday that unless this question was cleared up, that it was highly prejudicial and a new trial would be granted.* The Court: If I felt it prejudiced the case, that is quite correct, and I would let it go further if Mr. Pruger thought it would dispel any prejudice his client had suffered."

Thus, we have a situation of a Trial Judge in open court demanding that certain evidence be produced. The evidence is produced and then, at *side bar*, the evidence is rejected, and no explanation is made to the jury that the plaintiff had complied with the request of the Court. On this subject the Majority Opinion comments: "The proffered testimony was at all times irrelevant and immaterial and had no proper place in the case." From my point of view this observation is as irrelevant and immaterial as the excluded testimony. The question here is not whether the evidence was proper but whether after demanding that it be produced the Judge could in fairness refuse to explain to the jury that it was he who had now decided that the evidence was not needed. The question is whether the plaintiff was not put in the light of having seemingly ignored a direct order of the Judge. The question is whether this seemingly contemptuous refusal on the part of the plaintiff did not amount to the straw which broke, in the jury's estimate, the back of this case.

There is no suggestion in this Dissenting Opinion that the Trial Judge was motivated by any interest in the defendant's case, despite the unfortunate choice of language in which he kept stating that he was "only trying to protect" defendant counsel's client.

The plaintiff attempted to show, by means of photographs, the condition of adjoining farms. The Court rejected the photographs and also excluded oral testimony on the condition of the farms. However, when a witness (D. S. Scholl) testified in behalf of the defendants as to erosion on farms in the vicinity of the defendant's mill, the Court proceeded to inquire into the matter: "The Court: Q. Do you know why there is erosion on these other farms? A. Well, I always thought—Q. Speak to the jury. A. Yes, I always

thought that that was quite a bit of neglect to allow it to erode and by poor practices and poor farming. Q. You referred to good farms and bad farms in the neighborhood. What do you mean by a good farm or a bad one? Do you mean the soil, or do you mean the way it is run? A. By the way it has been farmed, the care it has been given, and general good husbandry. The Court: I have no further questions. A. It makes a good farm."

The record shows that the Trial Judge asked many questions throughout the trial and this demonstrates a commendable interest in the issues before him and the jury for adjudication. However, unless the presiding judge is unusually well versed in the subject matter of the litigation, questions should be restricted to the ascertainment of information rather than take the form of a searching, probing inquisition with implied criticisms and innuendo as to dishonesty, cunning and scheming on the part of witnesses. A judge's examination of witnesses should always serve as a lantern of impartial light and should never become a spear of attack against one side or the other.

It is my view that, unlike the European system, the presiding judge should not undertake the task of unfolding the complicated evidence of any trial. He may be gifted with the clairvoyance of the ancient oracles and possess the intuitive genius attributed to Daniel Webster, but with all these attributes he still cannot know more about the case (by a hasty reading of the pleadings and a few minutes' listening to testimony) than the lawyers who have studied and sweated over the case for months, who have talked to witnesses, who have examined the locale of the event in dispute, prepared trial briefs and generally have toiled, worried and lost sleep in preparation for this very trial which

is supposedly to be in their hands for unfoldment to the deciding tribunal.

Nothing can be more disconcerting to trial counsel, and to that extent disruptive of the orderly procedure of a trial, than an impatient judge who is constantly interrupting the proceedings, volunteering irrelevant or uninformed observations, and in general assuming the attitude that one or the other or both attorneys are trying to lay traps and snares for the Court and the jury. This judicial tyrannizing, petty as it may be, can be humiliating to lawyers, confounding to witnesses and dictatorial to the jury, depriving them of that mental freedom for an impartial approach to the responsibilities assigned them by the law of the land.

This case is directly in point. Without intending, of course, to be biased, the Trial Judge's animadversion of the plaintiff's witnesses and lawyers and the manner of his ruling and questioning, gave the impression that he saw no merit in the plaintiff's cause. His audible viewpoint was as unjust as it was unintended. The spectacles through which the Judge sees a case are usually taken over by the jury when they come to view the entire litigation in the privacy of the jury deliberating room. It may be that the plaintiff was not in justice and law entitled to a verdict, but it is not apparent in the record that he was allowed a fair and full opportunity to demonstrate whether he was or not. What was said in *Commonwealth v. Myma,* 278 Pa. 505, 508, may well be repeated here:

"The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the

jury box and at the counsel table. To depart from the clear line of duty through questions, expressions or conduct, contravenes the orderly administration of justice. It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence. Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses' credibility, or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them."

" 'Conversation between the judge and counsel in court is often necessary, but the judge should be studious to avoid controversies which are apt to obscure the merits of the dispute between litigants and lead to its unjust disposition. In addressing counsel, litigants, or witnesses, he should avoid a controversial manner or tone . . .' "

It is my considered judgment, without reflecting on the admitted ability of the Trial Judge and the rectitude of his intentions, that he allowed his own private reaction to the testimony to show through his robes and to that extent he deprived the plaintiff of the fair and impartial adjudication to which he was entitled.

I would accordingly order a new trial.