James B. NEWTON and Philadelphia Maintenance Co., Inc. Plaintiffs,

v.

FIRST UNION NATIONAL BANK [1] Defendant.

No. 01–CV–6283.

United States District Court, E.D. Pennsylvania.

May 3, 2004.

1. The clerk is directed to amend the caption on the docket consistent with the caption of this opinion.

Anthony J. Mazullo, Jr., Mazullo & Murphy, P.C., Doylestown, PA, Kevin J. Murphy, Stengel Moyer & Mazullo PC, Doylestown, PA, Robert M. Stengel, Robert M. Stengel, PC, Doylestown, PA, for Plaintiffs.

Douglas H. Riblet, Curtin & Heefner, LLP, Philadelphia, PA, John J. Hart, Curtin & Heefner, Morrisville, PA, Daniel P. Mazo, Curtin & Heefner, LLP, Morrisville, PA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiffs James B. Newton ("Newton"), an African American, and Philadelphia Maintenance Inc. ("PMC"), a corporation of which Newton is the president and sole shareholder, bring this action against First Union National Bank[2] [hereinafter "the Bank"] alleging that the Bank improperly demanded repayment of a line of credit ("Line of Credit") issued to PMC on October 19, 1995, ultimately obtaining a confessed judgment against Newton for the outstanding amount under the Line of Credit. Plaintiffs further allege that the Bank breached an agreement to make a certain advance to PMC under the Line of Credit.

The following three causes of action remain[3]: (1) claim by Newton for racial discrimination in violation of 42 U.S.C. § 1981 in connection with the Bank's following actions: demanding repayment of the Line of Credit, refusing to extend additional credit, and entering judgment against Newton personally; (2) claim by Newton and PMC for lack of good faith and fair dealing in connection with the Bank's following actions: demanding repayment of the Line of Credit, refusing to give PMC a certain advance under the Line of Credit, and entering judgment against Newton personally; (3) claim by PMC for breach of contract in connection with the Bank's alleged refusal to make a certain advance under the Line of Credit.[4] Presently before this court is the Bank's motion for summary judgment on all counts. For the reasons that follow, the Bank's motion is granted.

---

2. First Pennsylvania Bank merged with Philadelphia National Bank on October 1, 1990. The entity resulting from the merger was named Corestates Bank. (Def.'s Mot. for Summ. J. ¶ 8.) Then, on or about May 16, 1998, Corestates merged with and into First Union National Bank. (*Id.*) Throughout this opinion, the term "Bank" refers to whichever entity was in existence at the respective time. First Union National Bank is now known as Wachovia Bank. (*Id.* at 1.)

3. Newton and an additional plaintiff, Albert E. Marriott ("Marriott"), initially set forth various claims against the Bank based upon the Bank's acceleration of the maturity of a mortgage loan granted to a partnership comprised of Newton and Marriott. On April 18, 2003, by stipulation, all claims relating to the mortgage loan and accompanying Commercial Promissory Note were withdrawn and dismissed with prejudice. Accordingly, Marriott is no longer a plaintiff in this case. The stipulation, however, preserved the rights of plaintiffs to use evidence regarding the actions of the Bank with respect to the mortgage and Commercial Promissory Note in support of plaintiffs' remaining claims against the Bank.

4. Although plaintiffs originally pled "breach of contract—misrepresentation/fraud," plaintiffs now acknowledge that their claim is "for breach of contract and not for misrepresentation or fraud." (Pl's Reply Br. at 4.)

## I. Factual Background [5]

As previously stated, PMC is a corporation of which Newton, an African–American, is the president and sole shareholder. (Newton 6/6/02 Dep. at 3.) At all relevant times, PMC was engaged in the business of providing janitorial services to institutional customers, primarily to the United States government. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1.) In order to obtain government contracts, PMC had to engage in a competitive bidding process. The bidding process included the requirement that PMC identify a financial reference and funding source. (Newton 11/7/02 Dep. at 27.) In addition to requiring a financial reference for the purpose of procuring new contracts, PMC's relationship with financing institutions was also important for the purpose of financing startup contracts in which PMC was to perform work prior to payment. (Pl.'s Resp. at 1.) To this end, PMC began its relationship with the Bank in approximately 1988 or 1989 when PMC was initially issued a line of credit. (Newton 6/6/02 Dep. at 6, 8.) From 1989 until the time of this suit, PMC never missed a payment on any loan issued by the Bank. (Pl.'s Resp. at 1.)

### A. PMC Line of Credit

As of 1995, Theresa DiCamillo ("DiCamillo"), then a vice president at the Bank, was the officer primarily responsible for the Bank's relationship with PMC. (Def.'s Mot. for Summ. J. ¶ 10.) On October 19, 1995, Newton, as President of PMC, executed a Master Demand Note which governed PMC's Line of Credit with the Bank. (*Id.*, Ex. C (Master Demand Note).) Most pertinently, the Master Demand Note contained, *inter alia*, the following provisions:

> NOTE NOT A COMMITMENT TO LEND—Borrower acknowledges and agrees that no provision hereof, and no course of dealing by Bank in connection herewith, shall be deemed to create or shall imply the existence of any commitment or obligation on the part of Bank to make Loans. Except as otherwise provided in a currently effective written agreement by Bank to make Loans, each Loan shall be made solely at Bank's discretion.
>
> . . . . .
>
> DEMAND NOTE—This note is and shall be construed as a "demand instrument" under the Uniform Commercial Code. Bank may demand payment of the indebtedness outstanding under this Note or any portion thereof at any time.

(*Id.*) According to the Master Demand Note, "loans" were defined as "loans and advances made by Bank evidenced by this [Master Demand] Note." (*Id.*) Furthermore, the maximum principal amount of the Line of Credit under the Master Demand Note was $350,000. (*Id.*) Under the Master Demand Note, PMC was the borrower. (*Id.*)

### B. The Guaranty

In addition to the Master Demand Note, Newton also signed a Guaranty ("Guaranty") on October 19, 1995. (*Id.*, Ex. D (Guaranty).) The Guaranty provided, in pertinent part, that Newton, as Guarantor, guaranteed the payment, performance and satisfaction when due of all "Obligations," defined as "all existing and hereafter incurred or arising indebtedness, obligations

---

5. Because defendant moves for summary judgment, the facts are set forth in the light most favorable to plaintiff. *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997). For purposes of citation to deposition transcripts, if a deposition was held on more than one day, the deposition will be cited in the following format: (Last name of witness, date [if held on more than one day], and page number).

and liabilities of the Obligor to the Bank." (*Id.*) The Guaranty defined the "Obligor" as PMC. (*Id.*) Furthermore, the Guaranty provided that "[p]ayment by each Guarantor is due upon demand by Bank and is payable in immediately available funds in lawful money of the United States of America." (*Id.*) Under the terms of the Guaranty, Newton, as an individual, personally guaranteed the obligations of PMC. The Guaranty also contained a clause, otherwise known as a "warrant of attorney," authorizing any attorney or clerk of court to confess judgment against Newton "upon the occurrence of a default or an Event of Default under or in connection with any of the Obligations, or at any time thereafter." (*Id.*)

In conjunction with the Guaranty, Newton signed an "Explanation and Waiver of Rights Regarding Confession of Judgment," which included the following information:

> The Obligor is agreeing that the Bank may enter this judgment and understands that the Obligor will be unable to contest the validity of the judgment, should the Bank enter it, unless the Obligor successfully challenges entry of the judgment through a petition to open or strike the judgment

(*Id.*, Ex. D (Explanation and Waiver of Rights Regarding Confession of Judgment).) Under the terms of the "Explanation and Waiver of Rights Regarding Confession of Judgment," Newton was identified as the "Obligor." (*Id.*)

### C. The Credit Freeze

According to plaintiffs, in 1998 through 1999, "PMC lost some contracts. PMC's tax returns showed accounting losses for PMC due to accounting changes and as Newton withdrew significant compensation." (Pl.'s Resp. at 2.) According to accountant reviewed financial statements, PMC showed net losses of $123,463 and $218,852, for fiscal years 1998 and 1999 respectively. (Def.'s Mot. for Summ. J. ¶ 20 (citing Wennemer Aff., Ex.s 1, 7).)

In December 1998, the Bank notified PMC that the Line of Credit was "frozen." (Newton 6/6/02 Dep. at 17.) In other words, the Line of Credit was thereafter limited to $250,000, roughly the amount which had already been lent to PMC by the Bank as of December 1998. In his deposition, Newton stated that the Bank froze the Line of Credit due to PMC's poor financial performance, a concern that had been expressed to Newton previously that year. (*Id.* at 61.)

Also at the end of 1998, PMC bid on a prospective contract with the Jacksonville Naval Air Station ("Jacksonville Contract") which was projected to generate $25,000 of net profit per month. (Pl.'s Resp. at 2.) According to plaintiffs, "with [the Bank's] consent, PMC identified [the Bank] in its bid as PMC's financial reference and funding source for this contract." (*Id.*) In this regard, in their response to the Bank's motion for summary judgment, plaintiffs contend that "PMC's representatives received repeated oral assurances and promises from Terri DiCamillo ... that if this contract were awarded, the $100,000 "frozen" unused amount on the [Line of Credit] would be released to fund the start-up costs on this Jacksonville Contract." (*Id.*)[6] Although plaintiffs represent these facts as true, they offer no evidentiary support for this contention. In fact, Newton's deposition belies this fact:

---

6. Likewise, the allegation in plaintiffs' amended complaint is that the Bank breached "the oral contract for extension of credit between Newton and [the Bank]" when the Bank refused to grant a further advance to PMC to finance the Jacksonville Contract and declared the Line of Credit in default. (Amend. Compl. ¶ 106.)

Question: Had [DiCamillo] prior to the time that you faxed notice of the award [of the Jacksonville Contract] to her said something indicating to you that she would provide you with additional money for that contract?

Answer: Yeah, comments like, you know, get the job and then, you know, we'll *review* it.

(Newton 6/6/02 Dep. at 21) (emphasis added).

After PMC was awarded the Jacksonville Contract, Newton faxed a copy of the award to DiCamillo and spoke with her. (*Id.* at 23.) According to Newton, during that conversation, DiCamillo informed Newton not only that the Bank would not fund the Jacksonville Contract, but also that PMC's account had been transferred to the "work-out department," which plaintiffs now identify as the Special Asset Management group, or "SAM." (*Id.* at 24, 71; Pl.'s Resp. at 2–3). The SAM was a unit within the Bank "responsible for managing the Bank's credit relationships with borrowers whose credit facilities were classified as 'distressed.'" (Def.'s Mot. for Summ. J. ¶ 32.)

On October 12, 1999, Newton and Keith Harris ("Harris"), PMC's Controller, met with DiCamillo and Tom Young ("Young"), another Bank employee who worked in the SAM group. (Newton 6/6/02 Dep. at 80.) While many of the specific exchanges between the parties at the meeting are contested, it is undisputed that Young informed Newton that the Bank intended to end its banking relationship with PMC and that the Bank expected immediate repayment of the funds already extended to PMC under the Line of Credit. (*Id.* at 91, 97; Harris Dep. at 172, 175, 177, 179.) According to Newton, Young refused to consider any of Newton's proposals regarding repayment of the loan, stating that "he [Young] wasn't interested in any pay-ments over time, the bank wanted its payments now" and insisting that "Newton personally pay off the loan" by obtaining a mortgage on his residence or selling a life insurance policy. (Newton 6/6/02 Dep. at 92, 95–96; Harris Dep. at 173–74.) Based upon Young's behavior toward Newton at the October 12, 1999 meeting, described by Newton as "hostile" and "demeaning" and by Harris as "aggressive," Newton concluded that Young's treatment of him was racially motivated. (Newton 6/6/02 Dep. at 99; Harris Dep. at 181.)

Following the October 12, 1999 meeting, Newton and Young exchanged a series of letters in which each party expressed their respective positions regarding repayment of PMC's Line of Credit. Finally, on November 16, 1999, the Bank, through its counsel, sent a letter ("PMC Demand Letter") to Newton in his capacity as President of PMC, notifying Newton that the Bank "demands the immediate payment in full of all indebtedness outstanding under the [Line of Credit]." (Def.'s Mot. for Summ. J., Ex. G.) The letter further stated:

We ask that you contact us upon receipt of this letter to arrange for the immediate payment of the aforesaid indebtedness. If the loan is not paid within 5 days of the date hereof, this letter shall also confirm that the bank may in its discretion at any time thereafter begin to accrue interest on the unpaid principal amount of the loan at 5% of the annual rate otherwise chargeable under the loan. If the Corporation [PMC] should request that the Bank provide the Corporation [PMC] with additional time to pay the Loan, then the Bank, in order to even consider such request, and without waiving any rights, would require that the Corporation [PMC] immediately provide the Bank with ... [additional] financial information: ... [and]

would require ... that the Corporation or you provide to the Bank additional collateral to repay the Loan.

(*Id.*)

On December 2, 1999, Newton sent a letter to the Bank requesting that the Bank reconsider its demand for immediate payment. Noting that PMC was "not adverse to posting additional corporate collateral," Newton requested additional time to repay the loan. (*Id.*, Ex. A.) Newton also advised the Bank that he would be willing to immediately reduce the outstanding balance contingent upon an agreement to "term out" the obligation, preferably on a forty-eight month schedule. (*Id.*)

In response, on December 7, 1999, the Bank sent Newton a letter ("Newton Demand Letter") representing that the Line of Credit had become due as of December 2, 1999, and demanding repayment by Newton in accordance with the Guaranty. (Def. Mot. for Summ. J., Ex. H.) On December 8, 1999, the Bank confessed judgment against Newton in the Court of Common Pleas, Montgomery County, Pennsylvania, in the amount of $252,126.67. (Pl.'s Resp., Ex. 9 (Confession of Judgment).) Also on December 8, 1999, the Prothonotary of Montgomery County sent a copy of the confession of judgment to Newton along with the Notice required by Rule 236 of the Pennsylvania Rules of Civil Procedure. (Def.'s Mot. for Summ. J., Ex. I (certified copy of common pleas docket); Pa. R. Civ. P. 236.) Thereafter, and in accordance with Rule 2958.1 of the Pennsylvania Rules of Civil Procedure, the Bank, through counsel, sent Newton a letter informing him that judgment had been entered against him and that, if Newton did not file a petition to open or strike the judgment within 30 days of the date of service of the Notice, the Bank could initiate execution proceedings. (Def.'s Mot. for Summ. J., Ex. I (certified copy of common pleas docket); Pl.'s Resp., Ex. 9; Pa. R. Civ. P. 2958.1.) By January 20, 2000, Newton, through PMC, repaid both the outstanding amount of principal and interest under the confession of judgment and a portion of the Bank's attorney's fees and costs. (Pl.'s Resp. at 3; Def.'s Mot. for Summ. J. ¶ 53.)

### D. Commercial Promissory Note

On April 22, 1998, Newton and Albert E. Marriott ("Marriott") executed a real estate loan in favor of the Bank, and evidenced by a Commercial Promissory Note. (Pl.'s Resp., Ex. 10 (Commercial Promissory Note).) The Commercial Promissory Note identified "Albert E. Marriott and James B. Newton—A General Partnership t/a 15 S. Main St. Associates" as borrower. (*Id.*) Furthermore, the Commercial Promissory Note provided:

Each of the following shall be an Event of Default hereunder: (a) the nonpayment when due of any amount payable under this Note or under any obligation or indebtedness to Bank of Borrower or any person liable, either absolutely or contingently, for payment of any indebtedness evidenced hereby, including endorsers, guarantors and sureties (each such person is referred to as an "Obligor"); (b) if Borrower or any Obligor has failed to observe or perform any other existing or future agreement with Bank of any nature whatsoever;

(*Id.*)

On January 20, 2000, the Bank, through counsel, sent a letter to Newton's counsel advising him that Newton's failure to perform his obligation as surety to the Bank under the Line of Credit constituted an "Event of Default" under the "Real Estate

Note"[7] and, as such "the Bank has authorized us to inform you for the benefit of your clients that it has elected to exercise its right under the Real Estate Note to declare immediately due and payable the outstanding balance owed under the Real Estate Note." (Def.'s Mot. for Summ. J., Ex. M.) Although plaintiffs allege that the "communications from Defendant [regarding the mortgage] were only sent to Newton individually and not to his Caucasian equal partner Marriott nor the Partnership," they bring forth no evidence to support this contention. (Pl.'s Resp. at 4–5.) After seeing the January 20, 2000 letter, Marriott, who had never personally received any correspondence from the Bank demanding payment of the real estate loan, called the Bank's mortgage department requesting a payoff balance. (Marriott 6/5/02 Dep. at 102–103, 104.) In early February 2000, having received no response from the Bank, Marriott called Young. (*Id.* at 104–105.) According to Marriott, Young refused to give Marriott a payoff amount, instead referring Marriott to the letters previously sent by the Bank and insisting that Marriott should "figure it out on [his] own." (*Id.* at 110–11.) When Marriott inquired as to why Young was giving Newton and Marriott "such a hard time," Young asked Marriott, "Why would you ever become a partner with that guy to start with?" (*Id.* at 112.) Finally, Young stated "I'm tired of dealing with these people." (*Id.*)

## II. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham,* 120 F.3d 392, 395 (3d Cir.1997).

## III. Discussion

The Bank moves for summary judgment on all of plaintiffs' claims. Because PMC has failed to bring forth any evidence in support of its claim that the Bank breached a contract, oral or otherwise, in refusing to extend PMC additional funds to support the Jacksonville Contract, and because, in fact, Newton's deposition testimony supports the opposite inference, the Bank will be granted summary judgment with respect to this claim. Plaintiffs' two remaining claims, therefore, consist of the following: (1) claim by Newton for racial discrimination in violation of 42 U.S.C. § 1981 in connection with the Bank's following actions: demanding repayment of the Line of Credit, refusing to extend additional credit to finance the Jacksonville Contract, and entering judgment against Newton personally; and (2) claim by Newton and PMC for lack of good faith and fair dealing in connection with the Bank's following actions: demanding repayment of the Line of Credit, refusing to allow PMC an advance under the Line of Credit to finance the Jacksonville Contract, and entering judgment against Newton personally.

In addition to substantive arguments regarding the merits of plaintiffs' claims, the Bank asserts that the doctrine of res judicata bars plaintiffs from asserting their claims in federal court. Specifically, the Bank argues that because Newton had an opportunity to assert each of his remaining

**7.** It appears that defendant refers to the Commercial Promissory Note as the "Real Estate Note."

claims in a petition to open or strike the judgment of confession entered in state court, but failed to do so, the doctrine of res judicata precludes Newton from relitigating those claims in this forum. The Bank further argues that because PMC is a corporation wholly owned by Newton, and as such is a party in privity with Newton, PMC is likewise precluded from asserting its remaining claim. (Def.'s Mot. for Summ. J. at 25.) Conversely, plaintiffs maintain that res judicata should not apply to their asserted claims, and that the specific procedural rules governing petitions to open or strike judgments of confession under Pennsylvania law prevented plaintiffs from asserting their claims in that forum.

■ Although the parties to this litigation did not raise the question of subject matter jurisdiction, and, more specifically, the possible relevance of the Rooker–Feldman doctrine, "a [federal] court ... will raise lack of subject-matter jurisdiction on its own motion." *Morel v. INS,* 144 F.3d 248, 251 (3d Cir.1998). Because the Rooker–Feldman doctrine determines jurisdiction, if applicable, it effectively ends the litigation in federal court and the court has no authority to address affirmative defenses such as res judicata. *Centres, Inc. v. Town of Brookfield,* 148 F.3d 699, 703 (7th Cir.1998) (cited with approval in *Parkview Assoc. P'ship v. City of Lebanon,* 225 F.3d 321 (3d Cir.2000)). If, however, Rooker–Feldman is not applicable, res judicata must then be considered. I will, therefore, begin my analysis by addressing the applicability of the Rooker–Feldman doctrine to Newton's claims, followed by an analysis of PMC's claim.

### A. Rooker–Feldman Analysis of Newton's Claims

The Rooker–Feldman doctrine derives from two Supreme Court decisions, *Rooker*

*v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Recognizing "the well-settled understanding that the Supreme Court of the United States, and not the lower federal courts, has jurisdiction to review a state court decision," the Rooker–Feldman doctrine precludes lower federal court jurisdiction over claims under "two circumstances: first, if the claim was 'actually litigated' in state court prior to the filing of the federal action or, second, if the claim is inextricably intertwined with [the] state adjudication, meaning that federal relief can only be predicated upon a conviction that the state court was wrong." *Desi's Pizza, Inc. v. City of Wilkes–Barre,* 321 F.3d 411, 419 (3d Cir.2003) (internal quotations and citations omitted).

Before I decide whether Newton's claims were "actually litigated" in the state court confession of judgment, I must first consider the scope of the prior litigation in the common pleas court. In that regard, a brief discussion of the Pennsylvania practice of confessions of judgment and petitions to open is helpful.

■ A confession of judgment clause in a contract "permits the creditor or its attorney simply to apply to the court for judgment against the debtor in default without requiring or permitting the debtor or guarantors to respond at that juncture." *Southwestern Pennsylvania Reg'l Council, Inc. v. Gentile,* 776 A.2d 276, 279 n. 3 (Pa.Super.Ct.2001) *quoting Silverman v. Eastrich Multiple Investor Fund, L.P.,* 51 F.3d 28, 31 (3d Cir.1995). After a confession of judgment, however, the defendant may petition to open or strike the judgment. "[W]hen there is a proceeding to open the judgment ... the litigation becomes an adversary proceeding in which there is an adjudication upon the merits of

the defenses raised." *Riverside Mem'l Mausoleum, Inc. v. Umet Trust,* 581 F.2d 62, 67 (3d Cir.1978). Pursuant to Pennsylvania law, to open a confessed judgment, a defendant must act promptly, allege a meritorious defense, and present sufficient evidence of that defense to require submission of the issues to a jury. *Bell Fed. Sav. & Loan Ass'n v. Laura Lanes,* 291 Pa.Super. 395, 435 A.2d 1285, 1286 (1981); Pa. R. Civ. P. 2959(e) ("If evidence is produced which in a jury trial would require the issues to be submitted to the jury the court shall open the judgment.").

In the absence of a petition to open or strike the confessed judgment, the procedure by which judgment is confessed in Pennsylvania state courts lacks the hallmarks of an adversary proceeding. *See Riverside Mem'l Mausoleum,* 581 F.2d at 67. Thus, because Newton failed to file a petition to open or strike the confession of judgment, he did not "actually litigate" anything in the state court proceeding.

The relevant consideration with respect to the applicability of the Rooker–Feldman doctrine in this case, therefore, is whether the claims presented to this court are "inextricably intertwined" with the state court adjudication.

For purposes of Rooker–Feldman analysis, "[a] plaintiff's claim for relief in a federal action is 'inextricably intertwined' with an issue adjudicated by a state court under two circumstances: (1) when in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered ... [or] (2) when the federal court must ....take action that would render [the state court's] judgment ineffectual." [8] *Desi's Pizza,* 321 F.3d at 421 (internal quotations omitted). Furthermore, "if a plaintiff's claims in federal court are inextricably intertwined with a previous state court adjudication, the district court lacks jurisdiction over those claims even if they were not raised in the state court." [9]

**8.** Although the passage in *Desi's Pizza* reads "and" rather than "or," "[t]he Court ... considered the two tests in the alternative." *ITT Corp. v. Intelnet Intern.,* 366 F.3d 205, 211 n. 11 (3d Cir.2004).

**9.** The Rooker–Feldman doctrine should not be confused with the doctrine of res judicata. As opposed to res judicata, which is an affirmative defense, the Rooker–Feldman doctrine concerns the jurisdiction of the federal court. Noting that "[t]he distinction between Rooker–Feldman and preclusion is important because Rooker–Feldman, as a jurisdiction doctrine, must override preclusion doctrines where it applies," the Third Circuit clarified the difference between the two doctrines in *Parkview:*

Equating the Rooker–Feldman doctrine with preclusion is natural; both sets of principles define the respect one court owes to an earlier judgment. But the two are not coextensive. Preclusion in federal litigation following a judgment in state court depends on the Full Faith and Credit Statute, 28 U.S.C. § 1738, which requires the federal court to give the judgment the same effect

as the rendering state would ... The Rooker–Feldman doctrine, by contrast ... rests on the principle that district courts have only original jurisdiction.

225 F.3d at 329 (quoting *GASH Assocs. v. Village of Rosemont,* 995 F.2d 726, 728 (7th Cir.1993)). In *Parkview,* the Third Circuit clarified that, in *Feldman,* the Supreme Court did not establish the broad proposition that "Rooker–Feldman precludes lower federal court jurisdiction over all claims that could have been raised in a previous state court proceeding." *Parkview,* 225 F.3d at 327; *Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Rather, if the plaintiff's claims were not previously raised in the state proceeding, the touchstone of Rooker–Feldman analysis is whether the federal claims are inextricably intertwined with the state court adjudication. Consequently, while "[t]he mere fact that the plaintiff[ ] could have brought ... [a] constitutional challenge in state court d[oes] not automatically trigger the Rooker–Feldman jurisdictional bar," the district court will lack jurisdiction over a plaintiff's claims in federal court, even if they were not raised in state court, if they are

*Parkview,* 225 F.3d at 327. I will begin by addressing the applicability of the Rooker–Feldman doctrine to Newton's claim that the Bank breached a duty of good faith and fair dealing, followed by an analysis with respect to Newton's § 1981 claim.

### 1. Good Faith and Fair Dealing Claim

With respect to the first circumstance listed above, Rooker–Feldman bars the plaintiff's federal claim when "granting . . . relief would require the federal court to conclude that the [s]tate [c]ourt made an incorrect factual or legal determination." *Desi's Pizza,* 321 F.3d at 421. In other words, if "federal relief . . . . [would] be predicated upon a conviction that the state court was wrong," then Rooker–Feldman applies. *Id.* at 421. With respect to the second circumstance listed above, a plaintiff's federal claim is precluded pursuant to the Rooker–Feldman doctrine if "the relief sought would undo or prevent the enforcement of the state court's order." *Id.* at 422.

 In order to consider whether the claims are inextricably intertwined, I must first decide what "questions of state law . . . the state court was obligated to reach in order to render its decision." *Id.* at 421. In the context of Pennsylvania law and procedure, "[a] confessed judgment . . . would necessarily imply a determination that plaintiff . . . was in default in the stated amount under a valid and enforceable note." *Zhang v. Haven–Scott Assoc., Inc.,* No. CIV.A.95–2126, 1996 WL 355344, at *8, 1996 U.S. Dist. LEXIS 8738, at *25 (E.D.Pa. June 21, 1996). Essential to the state court's determination that Newton was in default of an enforceable note, and inextricably intertwined with it, was a determination that the Bank's demand for

inextricably intertwined with the previous state court adjudication. *Parkview,* 225 F.3d

repayment was lawful. To ask this court to adjudicate Newton's claim that the Bank breached an implied duty of good faith and fair dealing in exercising its express rights under the Master Demand Note and Guaranty, is to ask this court to potentially nullify a necessary underpinning of the state court judgment. This I cannot do. "Consistent with the overwhelming precedent in this court construing the Rooker–Feldman doctrine narrowly," I find that Newton's good faith and fair dealing claim is inextricably intertwined with the prior state court confession of judgment such that this court lacks subject matter jurisdiction over the claim. *Parkview,* 225 F.3d at 326. Summary judgment, therefore, will be granted to the Bank with respect to Newton's good faith and fair dealing claims.

An alternative basis for finding that a good faith and fair dealing claim is "inextricably intertwined" with the confessed judgment is that Pennsylvania courts do not recognize a breach of good faith claim as an attack on rights expressly granted by the terms of a contract between a borrower and a lender. In *Creeger Brick v. Mid–State Bank,* the Pennsylvania Superior Court held that while the duty of good faith has been recognized under Pennsylvania law in limited circumstances, the "Supreme Court of Pennsylvania has refused to impose a duty of good faith which would modify or defeat the legal rights of a creditor." 385 Pa.Super. 30, 560 A.2d 151, 154 (1989). Furthermore, with respect to the relationship between a borrower and lender, the *Creeger Brick* court held that "[t]he duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of

at 328.

its contract ... a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds." [10] *Id.* at 154. In this case, the Master Demand Note included an express provision that the "Bank may demand payment of the indebtedness outstanding under this Note or any portion thereof at any time." (Def.'s Mot. for Summ. J., Ex. C (Master Demand Note).) The Master Demand Note also included express provisions alerting PMC that loans would be made solely at the Bank's discretion, and that "no course of dealing by Bank in connection herewith, shall be deemed to create or shall imply the existence of any commitment or obligation on the part of Bank to make Loans." (*Id.*) Under the terms of the Guaranty, Newton, as an individual, personally guaranteed PMC's indebtedness and authorized any attorney or clerk of court to confess judgment against him "upon the occurrence of a default." (*Id.*, Ex. D (Guaranty).) The Bank, therefore,

did not violate a duty of good faith and fair dealing when it exercised its rights under the Master Demand Note and Guaranty because no such duty existed. [11] Given that Pennsylvania law does not recognize a good faith claim in this context, the state court's finding that the contract was valid and enforceable essentially concluded a claim of breach of good faith and fair dealing to the exercise of any rights under the contract.

#### 2. Section 1981 Claim

■ On the other hand, and as opposed to Newton's good faith and fair dealing claim, Newton's § 1981 claim is not barred by the Rooker–Feldman doctrine. First, Newton's § 1981 claims are not based solely on the Bank's actions in demanding repayment of the Line of Credit, but also encompass allegations that the Bank discriminated against Newton in failing to extend additional credit to finance the Jacksonville Contract, and in entering judgment against Newton personally as

**10.** Although I find that this court does not have jurisdiction over Newton's good faith and fair dealing claim with respect to the Bank's actions in demanding repayment of the Line of Credit, Newton also asserted a good faith and fair dealing claim with respect to the Bank's actions in refusing to allow PMC an advance under the Line of Credit to finance the Jacksonville Contract and entering judgment against Newton personally. Because the Bank had the express right to decline credit extensions under the Master Demand Note, and to enter judgment against Newton personally under the Guaranty, these claims likewise fail to state causes of action under Pennsylvania law.

**11.** Likewise, in a case factually similar to the present action, namely *Heritage Surveyors & Engineers, Inc. v. Nat'l Penn Bank*, the Pennsylvania Superior court followed *Creeger* and affirmed the lower court's dismissal of plaintiff's claim for breach of an implied covenant of good faith and fair dealing for failure to state a cause of action. 801 A.2d 1248 (Pa.Super.Ct.2002). In *Heritage*, plaintiff sued National Penn Bank following the Bank's demand for repayment of an amount

borrowed by plaintiff under a line of credit. *Id.* at 1249–50. Affirming the lower court, the Pennsylvania Superior Court held that "to the extent Heritage argues that National Penn Bank violated a duty of good faith and fair dealing with regard to the enforcement of the promissory note at issue, we find that such a duty did not exist." *Id.* at 1253–54.

It is important to note, however, that the *Heritage* court also recognized that an exception to the general rule established in *Creeger* may exist in limited circumstances, specifically where there is a long-standing relationship between the lending institution and the borrower. *Id.* at 1254 n. 4 (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053 (Pa.Super.Ct.1999) (nineteen year relationship involving at least six personal and business loans)). In the instant case, PMC and the Bank do not have such a relationship. According to plaintiffs, PMC's relationship with the Bank began with a line of credit issued in 1988 or 1989, approximately ten years before the credit freeze in 1998, during which time the Bank underwent two mergers.

guarantor. Second, unlike Newton's good faith and fair dealing claim, a potential decision in Newton's favor on his federal statutory discrimination claim would not necessitate a finding that the state court erred in adjudicating Newton in default under the Guaranty. Specifically, the § 1981 claim differs from the good faith claim because it does not follow from the state court judgment that the Bank acted without discriminatory motives. Thus, the state court's finding that Newton was in default does not mean that the Bank's actions comported with 42 U.S.C. § 1981, "which prohibits racial discrimination in the making and enforcing of contracts and property transactions." *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 796 (3d Cir. 2001). Adjudication of Newton's § 1981 claim by a federal court, therefore, would not require a determination that the state court was wrong, nor would it "undo or prevent the enforcement of the state court's order." *Desi's Pizza*, 321 F.3d at 422.

In an analogous case, the Third Circuit in *Desi's Pizza* held that although plaintiff's bar and restaurant had previously been adjudicated to be a public nuisance in a state court proceeding, the Rooker–Feldman doctrine did not bar plaintiffs from bringing a separate § 1981 action in federal court alleging that they had been selectively prosecuted. *Id.* at 411. Specifically,

the Third Circuit held that "the state court's finding that Desi's was a "common nuisance" under Pennsylvania law does not mean that a "campaign of harassment" against that establishment, such as the one allegedly waged by the defendants, would comport with … 42 U.S.C. §§ 1981 and 1982." *Id.* at 423. Likewise, in this case, the confession of judgment against Newton in state court does not mean that Newton was not the target of discrimination in violation of § 1981.

For these reasons, I conclude that while Newton's good faith and fair dealing claim is "inextricably intertwined" with the state court judgment for purposes of the Rooker–Feldman doctrine, Newton's § 1981 claim is not.

## B. PMC's Claim

PMC also states a claim against the Bank for lack of good faith and fair dealing. Because I would inevitably decide that PMC's claim for lack of good faith and fair dealing fails to state a cause of action under Pennsylvania law for the same reasons as previously stated with respect to Newton's identical claims, I decline to decide the issue of whether PMC is also precluded from asserting this claim in federal court under the Rooker–Feldman doctrine.[12] I conclude, therefore, that summary judgment will also be granted to the Bank with respect to PMC's claim.

**12.** While the Third Circuit has "consistently … held that Rooker–Feldman does not bar claims of plaintiffs who were not parties to the state court proceeding," that court has "also noted that this limiting principle of the Rooker–Feldman doctrine has a close affinity to the principles embodied in the legal concepts of claim and issue preclusion." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 364 F.3d 102, 105 (3d Cir.2004) (internal citations and quotations omitted); *see also infra* note 7. Recognizing that, under preclusion principles, "[c]laims and issues decided against an entity bind also its parties in privity, including sub-

sidiaries," the court in *Exxon Mobil* held that the Rooker–Feldman doctrine applied where the federal plaintiff's subsidiaries were a party to the state court action, but the federal plaintiff was not, and the federal claims were identical to the claims on which the state court reached final judgment. *Exxon Mobil*, 364 F.3d at 105. Because PMC's claim fails to state a cause of action, I will not address the question of whether PMC is in privity with Newton under preclusion principles for purposes of applying the Rooker–Feldman doctrine.

## C. Res Judicata Analysis of Newton's § 1981 Claim

Because this court's adjudication of Newton's § 1981 claim is not barred by the Rooker–Feldman doctrine, I will proceed to address the Bank's argument that Newton's § 1981 claim is barred by res judicata.

 It is hornbook law that when a final judgment on the merits has been rendered by a court of competent jurisdiction, the doctrine of res judicata will bar any future suit on the same cause of action between the same parties or their privies. *Goldstein v. Ahrens,* 379 Pa. 330, 108 A.2d 693 (1954). Under Pennsylvania law, the doctrine of res judicata applies when the two actions possess the following common elements: (1) identity of the thing sued upon; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the capacity of the parties.[13] *Glynn v. Glynn,* 789 A.2d 242, 249 (Pa.Super.Ct.2001). "[A]ll matters which might have been raised and decided in the former suit, as well as those which were actually raised therein, are res adjudicata in a subsequent proceeding between the same parties and their privies." *Hopewell Estates, Inc. v. Kent,* 435 Pa.Super. 471, 646 A.2d 1192, 1194 (1994) (citing *Nevling v. Commercial Credit Co.,* 156 Pa.Super. 31, 39 A.2d 266, 267 (1944)). Furthermore, "proceedings on a petition to open a judgment may be sufficient to bar a subsequent suit only where each of the elements constituting res judicata have been met." *Id.* at 1194.

In evaluating the applicability of the doctrine of res judicata to the facts of this case, I am mindful of the principle, elucidated by the Pennsylvania Supreme Court, that "[t]he doctrine of res judicata is based on public policy and seeks to prevent an individual from being vexed twice for the same cause." *Stevenson v. Silverman,* 417 Pa. 187, 208 A.2d 786, 788 (1965). In light of the policy behind application of res judicata, "[t]he rule should not be defeated by minor differences of form, parties, or allegations, when these are contrived only to obscure the real purpose,-a second trial on the same cause between the same parties." *Id.*

Because I find that the element of "identity of the cause of action" is dispositive, I will begin and end with a discussion of whether Newton's instant § 1981 claim and the prior confessed judgment share an "identity of the cause of action." Because, under Pennsylvania law, "a judgment by confession is a final judgment 'on the merits'" and, therefore, res judicata will apply "where the ... claims could have been raised in confession of judgment proceedings through a petition to open or strike off the judgment entered upon confession but were, instead, raised in a new action," application of this element takes on a slightly different cast than when an issue was actually raised in a prior proceeding. *Zhang v. Southeastern Fin. Group, Inc.,* 980 F.Supp. 787, 792 (E.D.Pa.1997) (judgment by confession is "final" and "on the merits); *Magee v. J.G. Wentworth & Co., Inc.,* 761 A.2d 159 (2000) (res judicata applies where claims could have been raised). In this case, therefore, the relevant question is not whether the instant causes of action *were* presented in state court, but

---

**13.** Generally, when a state court has entered judgment on the merits, the scope and application of res judicata is determined according to the law of the rendering state, in this case Pennsylvania. *Riverside,* 581 F.2d at 66. In other words, a federal court will give the state court judgment the same preclusive effect as the judgment would be given under the law of the state in which it was rendered. *Zhang,* 1996 WL 355344, at *7, 1996 U.S. Dist. LEXIS 8738, at *22.

whether the instant causes of action *could have been* presented in the state court action. *See Romah v. Romah,* 411 Pa.Super. 12, 600 A.2d 978, 981 (1991) (holding that because plaintiff's claims were all subject to resolution during the confession of judgment proceedings had plaintiff raised them by petition to open or strike off the judgment, the "causes of action" were the same for purposes of applying this element of a res judicata analysis).

As previously stated, pursuant to Pennsylvania law, to open a confessed judgment, a defendant must act promptly, allege a meritorious defense, and present sufficient evidence of that defense to require submission of the issues to a jury. *Bell Fed. Sav. & Loan Ass'n,* 435 A.2d at 1286; Pa. R. Civ. P. 2959(e). Because Newton did not file a petition to open or strike the confession of judgment entered in state court, "res judicata bars consideration in a second suit of defenses which . . . [Newton] might have, but did not raise in his original petition to open." *Riverside,* 581 F.2d at 67 (internal citation omitted) (citing *Nevling,* 156 Pa.Super. 31, 39 A.2d 266). It is integral to our analysis, therefore, to determine whether Newton's § 1981 claim could have been raised as a "meritorious defense" for the purpose of opening the confessed judgment in state court.

Under Pennsylvania law, while a defense is capable of opening a confessed judgment, "[i]n the absence of fraud, an unliquidated counterclaim or set-off is not grounds for opening a judgment confessed under a warrant of attorney." *J.M. Korn & Son, Inc., v. Fleet–Air Corp.,* 300 Pa.Super. 458, 446 A.2d 945, 947 (1982) (citing, *inter alia, Harrison v. Galilee Baptist Church,* 427 Pa. 247, 234 A.2d 314, 316 (1967); *Harrison v. Stoeckert,* 369 Pa. 143, 85 A.2d 154, 155 (1952); *G.A.C. Credit Corp. v. Acme Accordian Studios, Inc.,* 220 Pa.Super. 148, 286 A.2d 678 (1971)). "An unliquidated counterclaim cannot form the basis for opening a confessed judgment because "[t]o a judgment there can be no set-off of a debt not in judgment. One judgment may be set off against another, through the equitable powers of the court but to a judgment ripe for execution, there can be but one answer, to wit, payment pure and simple." " *J.M. Korn,* 446 A.2d at 947 (quoting *Harrison v. Stoeckert,* 85 A.2d at 155). Plaintiffs claim that Newton's § 1981 claim does not constitute a "meritorious defense" capable of opening the confessed judgment under Pennsylvania law. (Pl.'s Reply Br. at 7.) Specifically, plaintiffs argue that because Newton's claim is a separate and distinct legal action from the confessed judgment, and has a measure of damages different from the amount owed to the Bank by PMC, it is more accurately characterized as an "unliquidated counterclaim." Defendant contests plaintiffs' interpretation of Pennsylvania law and procedure.

Distinguishing between "counterclaims" and "defenses," the Third Circuit has held that while "[a] counterclaim may entitle the defendant in the original action to some amount of affirmative relief, a defense merely precludes or diminishes the plaintiff's recovery" and "[a]lthough the facts underlying some defenses might also support a counterclaim, not all counterclaims are valid defenses." *Riverside,* 581 F.2d at 68. Further elucidating the distinction, the Pennsylvania Supreme Court has held that, in the context of petitions to open confessed judgments, "[a] set-off is a 'counter-claim demand which defendant holds against plaintiff, arising out of a transaction *extrinsic* of plaintiff's cause of action.' " *M.N.C. Corp. v. Mount Lebanon Medical Center, Inc.,* 510 Pa. 490, 509 A.2d 1256, 1259 (1986) (quoting BLACK'S LAW DICTIONARY 1230 (rev. 5th ed.1979) (emphasis added)).

■ In this case, Newton's claim that the Bank violated § 1981 arises from facts and circumstances extrinsic to Newton's default as guarantor of PMC's indebtedness. Rather than disputing the validity of the default under the Guaranty or Master Demand Note, Newton's § 1981 claim challenges the motives underlying the Bank's actions in its dealings with Newton and PMC. In that regard, Newton's § 1981 claim could not have been asserted as a meritorious defense to open the confessed judgment. Any potential judgment in favor of Newton on his civil rights claim would not nullify the prior confessed judgment. Newton's § 1981 claim, therefore, is not barred by res judicata.

### D. Newton's § 1981 Claim

Because this court's adjudication of Newton's § 1981 claim is not barred by res judicata, I will proceed to address the Bank's argument that Newton's § 1981 claim is barred by the applicable statute of limitations. The parties do not dispute that Newton's § 1981 claim is subject to a two year statute of limitations and that federal law governs when a civil rights action accrues. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 662, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Sandutch v. Muroski*, 684 F.2d 252, 254 (3d Cir.1982) (citing *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir.1975) (accrual of civil rights action is a question of federal law)). Under federal law, a claimant's civil rights cause of action accrues when the claimant "knew or had reason to know of the injury that constitutes the basis of [the] action." *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir.1998) (action under 42 U.S.C. § 1983); *Clark v. Sears, Roebuck & Co.*, 816 F.Supp. 1064, 1068 (E.D.Pa.1993) ("The limitations period for Section 1981 ... cases commences when the plaintiff knows or reasonably should know that the discriminatory act has occurred.")

Plaintiffs filed their initial complaint on December 13, 2001. In plaintiffs' amended complaint, plaintiffs allege that the Bank discriminated against Newton in violation of § 1981 when the Bank refused to extend additional credit to finance PMC's Jacksonville Contract (sometime prior to October 12, 1999), when the Bank demanded repayment of the Line of Credit (from PMC on November 16, 1999 and from Newton personally on December 7, 1999), and when the Bank confessed judgment against Newton personally on December 8, 1999. The discriminatory actions on which Newton bases his § 1981 claim, having occurred prior to December 13, 1999, are all time-barred under the applicable two year statute of limitations. Notwithstanding this fact, Newton asserts two theories under which his claim is timely: first, Newton claims that because he has made additional claims that arose within the statutory period, his § 1981 action is preserved by application of the "continuing violations" doctrine; second, and as an apparent alternative to his first theory, Newton claims that his § 1981 "injury" did not occur until he actually paid the confessed judgment on January 19, 2000, making his complaint timely. I will address each argument in turn.

■ "The continuing violations doctrine is an equitable exception to the timely filing requirement." *Cowell v. Palmer Township*, 263 F.3d 286, 292 (3d Cir.2001) (internal quotations omitted). "[I]f the alleged discriminatory conduct is a 'continuing violation,' the statute of limitations begins to run on the date of the last occurrence of discrimination, rather than the first." *Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 842 (3d Cir. 1992). Proceeding under this doctrine, a plaintiff may pursue a claim for discriminatory conduct that began prior to the

filing period if the act is part of an ongoing practice or pattern of discrimination of the defendant. In order to establish that a claim falls within the continuing violations doctrine, plaintiff must: (1) demonstrate that "the last act evidencing the continuing practice falls within the limitations period"; and (2) "establish that the defendant's conduct is more than the occurrence of isolated or sporadic acts." *Cowell,* 263 F.3d at 292.

The discriminatory acts which Newton alleges took place within the filing period consist of the following: the Bank's demanding payment of the Real Estate Loan from Newton only, as opposed to from Newton and Marriott collectively, in January 2000 and the February 2000 comments made by Young to Marriott, which were allegedly racist. (Pl.'s Resp. at 14, 15.) Assuming, *arguendo,* that at least one of these acts satisfies the requirement that Newton demonstrate that "the last act evidencing the continuing practice falls within the limitations period," I will analyze whether Newton has satisfied his burden of establishing that the Bank's conduct was not isolated or sporadic.

To establish that the Bank's conduct was not isolated or sporadic, "[t]he relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern." *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 755 (3d Cir.1995). In evaluating this distinction, a court should consider "at least three factors: (1) subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency—whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence—whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether

the consequences of the act would continue even in the absence of the continuing intent to discriminate." *Cowell,* 263 F.3d at 292. In considering these factors, "the consideration of 'degree of permanence' is the most important." *Id.* Furthermore, the "act" whose "permanence" is of preeminent importance is the defendant's acts which first gave rise to the claim. Even assuming *arguendo* that the first two factors weigh in Newton's favor, I find that consideration of the third factor weighs so heavily against applying the continuing violations doctrine to this case that it is virtually dispositive.

As previously stated, the third factor, or whether the acts which first gave rise to the claim had a "degree of permanence" which should trigger the plaintiff's awareness of and duty to assert his rights, is the most important of the three factors. For the purpose of applying the "degree of permanence" factor, the Third Circuit in *Cowell* noted that "we must consider the policy rationale behind the statute of limitations. That is, the continuing violations doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable diligence in pursuing their claims." *Id.* at 295. The underlying rationale is that "if the prior events should have alerted a reasonable person to act at that time, the continuing violation theory will not overcome the relevant statute of limitations." *King v. Township of East Lampeter,* 17 F.Supp.2d 394, 416 (E.D.Pa.1998). Newton, by his own admission, was clearly aware of the alleged wrongfulness of the Bank's actions as of October 12, 1999. In his deposition, Newton made the following statements:

[speaking of October 12, 1999 meeting] Question: Did you conclude as a result of that meeting that Mr. Young was racially biased?
Answer: Yes.

Question: And what was your basis, just the behavior that you described?

Answer: Absolutely. And, you know, it's an inner sense that you have when you're dealing with hostile people ... There was no reason for him to act that way... There was no reason for him to try to humiliate me, absolutely not. So, yeah, he's a racist.

Question: And you concluded that as a result of that meeting?

Answer: Yes.

. . . . .

■ Question: But you were satisfied based on, I take it, what you perceive to be his racial bias at the meeting on October 12 that you were never going to be able to satisfy any terms that he might present to you to work out the Philadelphia Maintenance Company loan, is that a fair statement?

Answer: Yes, and it proved to be true. (Newton 6/6/02 Dep. at 99.) Given Newton's unequivocal admissions regarding his understanding of the Bank's illicit motivations as of the October 12, 1999 meeting, the Bank's actions, culminating with the confession of judgment against Newton on December 8, 1999, carried a "degree of permanence" which effectively triggered Newton's duty to assert his rights within the two year statute of limitations. Newton's failure to act with reasonable diligence in filing his claim, therefore, cannot be excused; this is the penalty for sleeping on your rights. I find, therefore, that the continuing violations doctrine is inapplicable to Newton's § 1981 claim.

■ Alternatively, Newton contends that his § 1981 claim is timely because his "injury" did not accrue until he actually paid the confessed judgment on January 19, 2000, such that his complaint was timely filed on December 13, 2001. This contention is clearly without merit under federal law. As previously stated, a claimant's civil rights cause of action accrues when the claimant "knew or had reason to know of the injury that constitutes the basis of [the] action." *Sameric Corp.*, 142 F.3d at 599 (action under 42 U.S.C. § 1983). In an analogous case concerning a § 1981 employment discrimination claim, the Supreme Court held that "[t]he proper focus [for the purpose of determining the date of accrual] is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (quoting *Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209 (9th Cir.1979)). In *Ricks*, the Supreme Court applied this standard to find that a college professor's § 1981 claim against his employer accrued when he was *notified* of the college's decision denying him tenure, as opposed to when his employment *actually terminated* approximately one year later. *Ricks*, 449 U.S. 250, 259, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (emphasis added). In this case, Newton knew of the allegedly discriminatory conduct well outside of the limitations period. Newton's actual payment of the confessed judgment was a "delayed, but inevitable, consequence" of the allegedly discriminatory acts, and not the date of "injury." *Id.* at 257–58, 101 S.Ct. 498. Newton's claim, therefore, cannot be saved by this theory either. Although I am concerned about the fact that this ruling leaves no opportunity to address the substance of the serious allegations lodged against the Bank in this case, Newton cannot revive his time-barred § 1981 claims by appeal to theories which are inapplicable to his case. The Bank's motion for summary judgment on Newton's § 1981 claim is granted.

## ORDER

AND NOW, this 30th day of April 2004, it is **ORDERED** that defendant's motion for summary judgment is **GRANTED** and this case is **DISMISSED WITH PREJUDICE.** Judgment is entered in favor of defendant and against plaintiff.